UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MICHAEL DEGRAW, individually and as
Personal Representative of the Estate of
JENNIFER DEGRAW, deceased,

     Plaintiff,

-v-

BOB GUALTIERI, in his official capacity as
Sheriff of PINELLAS COUNTY, FLORIDA,     CASE NO.:  8:11-CV-720-EAK-MAP

     Defendant.

_____/

## PLAINTIFF'S TRIAL BRIEF

Plaintiff, MICHAEL DEGRAW, individually and as Personal Representative of the

ESTATE OF JENNIFER DEGRAW, by and through his undersigned counsel, hereby submits

this trial brief.

## PRELIMINARY STATEMENT

Plaintiff's decedent Jennifer Degraw ("Degraw") died on March 24, 2009 while in pre-

trial detention at the Pinellas County Jail. Plaintiff seeks damages under 42 U.S.C §1983 for

violations of Degraw's rights under the Fourteenth Amendment, and under the Florida Wrongful

Death Act.

## STATEMENT OF FACTS[1]

**The Arrest:** On March 16, 2009, Plaintiff, Degraw's husband, called the police, told

them Degraw had stopped taking her bipolar-disorder medication, and asked them to take

---

[1] The statement of facts is essentially reprinted from Plaintiff's Response to Defendants Motion for Partial Summary Judgment. All references to exhibits are to those exhibits contained therein.

1

Degraw to a hospital where she would receive medication and treatment. (**Exhibit 1**, p. 80, 83.) When the officers arrived, Degraw screamed, ranted, and spoke in gibberish at them. (Ex.1 at 89, 94.) Instead of taking Degraw to a mental health facility, the officers charged her with felony battery upon a police officer for allegedly kicking one of them, and delivered her to the Pinellas County jail (the "Jail"). (Ex.1 at 94- 97.)

**The Intake:** Upon her arrival at the Jail, Brian Kourim, R.N. assessed Degraw and noted that she: 1) had been taking Topomax (an anti-psychotic medication (*See* **Exhibit 2**, p. 77-78) for eleven years, but had not taken any for the past forty-three days; and 2) exhibited abnormal behavior and made bizarre statements. (Doc. 59-1 at 11 & 14.) Kourim recommended that Degraw be placed on close observation. (Doc. 59-1 at 12.)

**The Death:** Degraw remained incarcerated at the Jail under close observation from March 16, 2009, until March 24, 2009, when she was transported to a hospital and declared dead. (Doc. 41, p. 8, ¶ 42; Doc. 42, p. 4 ¶ 42.) Degraw's autopsy showed that Degraw died from a fluid and electrolyte imbalance, apparently caused by a lack of attention to her metabolic needs. (Ex. 2 at 33; **Exhibit 3** at p. 1; Ex.A at 42, 73.) A contributory cause of death was hypertension. (Ex.3 at 1.)

**The Deliberate Indifference:** In 2009, Dr. Timothy Bailey was the Jail's sole medical director. (Ex.B at 3-4, 21.) Dr. Bailey did not know whether Degraw was in the Jail as a Baker Act and claimed the Baker Act was outside his area of influence. (*Id. at* 30, 32.) The records, however, clearly reflected that Degraw was a Baker Act. (Ex.B at 30-32.) Nevertheless, Dr. Bailey denied that Degraw was psychotic when she arrived at the Jail, but admitted that psychosis would have been part of his differential diagnosis of her. (*Id.* at 35-36.) He claimed, however, that he did not have the authority to determine whether she was psychotic. (*Id.*)

2

Dr. Bailey saw Degraw twice during her eight-day incarceration. (Ex.B at 37-38, 67.) The first time, on March 17, 2009, Dr. Bailey noted that that Degraw was "uncooperative" and had no obvious neurological deficits. (Ex.B at 40.) Dr. Bailey did not physically examine Degraw or write any orders for her, including any order for the nursing or detention staff to monitor her nutritional or fluid intake. (*Id.* at 41, 45.) Dr. Bailey also did not order a psychiatric evaluation for Degraw that day because he assumed she would receive one in due course. (*Id.* at 42.)

The second time Dr. Bailey saw Degraw was March 19, 2009. (Ex.B at 67.) By this time, the jail staff had verified Degraw's medications and a nurse practitioner had prepared a list of suggested medication for her, which included potassium chloride, for her history of vomiting, Lisinopril for hypertension, and Dilantin for seizure disorder. (*Id.* at 53-54, 55, 66; Doc. 59-1.) Again, Dr. Bailey did not attempt to perform a physical examination on Degraw, nor did he obtain a history from her husband. (Ex.B at 68, 69.) Dr. Bailey noted that Degraw was "very uncooperative," refusing to answer questions, had a strong psychiatric history, but no known seizures. (Ex.B at 68-69.) Despite the fact that she had no seizure history and the fact that Dr. Bailey knew Degraw needed a psychiatric evaluation and appeared to be suffering from psychosis, Dr. Bailey assumed that, before her incarceration, Degraw had been taking Topomax for seizures rather than for bipolar disorder. (*Id.* at 56-58.) Thus, Dr. Bailey ordered Dilantin rather than Topomax for Degraw. (*Id.*) Dr. Bailey did not prescribe any medications to treat Degraw's chronic bipolar disorder or her acute psychotic state. (Ex. B at 69-70; Doc. 59-1, 59-2, 59-3.)

Dr. Bailey testified that because Degraw was uncooperative and refused her medications, all he could do was monitor her. (Ex.B at 58-59.) He admitted that her possible

3

psychosis was likely the reason she would not take her medications, but claimed he could not force medicate her if she refused treatment or was uncooperative. (*Id.* at 72-73.

Dr. Bailey had previously conceded, however, that if Degraw was refusing medication because she was psychotic, he could forcibly administer medication, but claimed that was a judgment call and that he did not want to physically hurt Degraw. (*Id.* at 59-60.) He did not think it was an acute medical emergency at that time. (*Id.*) Dr. Bailey took this position even though he knew Degraw had a history of sporadic vomiting over the prior three years, and that vomiting is a common cause of metabolic imbalance. (*Id.* at 34, 55.) Nevertheless, Dr. Bailey opted for observation rather than forced medication. (*Id.*) Subsequently, however, Dr. Bailey claimed he could not issue an emergency treatment order for Degraw because that was the psychiatric team's responsibility. (Ex.B at 74.)

Jennifer Trivoli, was a licensed clinical social worker, who was part of the Jail's psychiatric team in 2009. (Ex.C at 4-5, 14-15.) Trivoli saw Degraw once, in the afternoon on March 19, 2009. (Ex.C at 34-35, 49.) Trivoli did not know that Degraw was at the Jail under the Baker Act because the staff was not given that information. (Ex.C at 19-20, 22.) However, when Trivoli saw her, Degraw was lying on the floor of the cell, half-dressed, and would not get up. (*Id.* at 38-40, 51.) She was nonsensical, rambling about religious-themed matters, and staring past Trivoli. (*Id.* at 40, 43, 52.) Trivoli said Degraw was either hallucinating or involved in a psychotic episode. (*Id.* at 40-43, 52.) Trivoli did not know if Degraw was not making sense because of her mental health or because of a medical condition. (*Id.* at 43.) Trivoli simply knew that Degraw was not capable of making important decisions for herself and was unable to cooperate with Trivoli's attempts to evaluate her. (*Id.* at 52-54, 59.)   Consequently, Trivoli referred Degraw to Dr. Richard Miller, the staff

4

psychiatrist.[2] (Ex.A at 10-11; Ex.C at 44.) Trivoli thoroughly described Degraw's condition to Dr. Miller and provided him with all the information contained in her chart note. (Ex.C at 47-49, 54.)

Even though Trivoli explained Degraw's psychiatric condition to Dr. Miller, Dr. Miller did not personally see or evaluate Degraw at any time during her nearly eight days at the Jail. (Ex.A at 10.) Dr. Miller agreed that Degraw was probably psychotic, had been prescribed verified psychotropic medication, and therefore, could be bipolar with psychoses. (*Id.* at 49-50.) Although it would take only three minutes to get from Dr. Miller's office to Degraw's cell to evaluate Degraw, Dr. Miller never made the effort because she was "uncooperative" and he did not believe she was in any immediate danger because she was not "running into a wall or something." (*Id.* at 32, 33, 35, 53, 61.) Dr. Miller stated that he had other patients to see. (*Id.*)

Dr. Miller admitted that in a general sense, a person's failure to take a particular electrolyte, like potassium, could be dangerous to them, but stated that no one knows what Degraw's metabolic status was because no laboratory tests were ever conducted. (*Id.* at 42, 66, Doc. 59-1, 59-2, 59-3.) Dr. Miller also admitted that a patient who needs potassium but will not take it is a danger to herself if the deprivation is severe and prolonged. (*Id.* at 66.) Dr. Miller agreed that if Degraw died of an electrolyte imbalance which caused an arrhythmia, it took too long for the Jail to take action on her behalf. (*Id.* at 70-71.)

Dr. Miller also agreed that Degraw was uncooperative because she was psychotic and had impaired judgment. (Ex. A at 70-71.) Dr. Miller admitted that Degraw was not just

---

[2] Even though Dr. Miller is a psychiatrist, he is still a medical doctor who is licensed and qualified to evaluate and treat medical conditions. *See Buffin v. Astrue*, 3:05-cv-01289-J-TEM, 2008 WL 784982, *7 (M.D. Fla.

refusing to take her medications; she lacked the ability to determine whether she should take them or not. (*Id.* at 54-55.) Nevertheless, Dr. Miller claimed he could not just force medicate Degraw and, therefore, all the staff could do was observe her. (*Id.* at 32, 35, 54.)

Dr. Miller acknowledged that Degraw's vital signs were never taken and laboratory tests were never performed while she was at the Jail, but nevertheless claimed there was no indication that Degraw had any acute medical condition that required immediate evaluation or treatment. (*Id.* at 33-34, 37, 40, 46; *see also* Docs. 59-1, 59-2, 59-3.) Dr. Miller made this statement even though he knew Degraw had some medical conditions, including hypertension, for which she had been prescribed medications, and that she had not been taking those medications for some time prior to her incarceration. (*Id.* at 35-35, 43-44.) Incredibly, Dr. Miller testified that he did not know why certain medications had been prescribed for Degraw because that would have been a matter for the medical team. (*Id.* at 37, 40.)

Dr. Miller did not write any orders for Degraw (which would include orders to monitor her nutritional or fluid intake) because he did not ever see her. (*Id.* at 43-44, 45, 47.) Dr. Miller claimed that the monitoring of a patient's nutritional and fluid intake is a nursing function that he did not have to instruct the nursing staff to perform. (*Id.* at 44.) The record shows, however, that there are only sporadic notations about whether Degraw ate or refused food. (Docs. 59-1, 59-2, 59-3.) There are no records that reflect Degraw's fluid intake, if any. (*Id.*) At the time of Degraw's death, her stomach contained no food and only 35 cubic centimeters of brown fluid. (Ex.3, p. 1.)

---

March 20, 2008) ("The Court takes notice that a psychiatrist is a medical doctor whose field of specialty is that of mental diseases and other conditions."); *see also* FRE 201(b).

6

Dr. Miller acknowledged that an emergency treatment order could be used to force emergency medication on a patient who is a danger to herself. (*Id.* at 56.) He even recalled a prior "uncooperative" patient with severe hypertension that was force medicated. (*Id.* at 20.) Dr. Miller had the authority to issue an emergency treatment order for forced medication under the policies and procedures promulgated by the Sheriff. (*See* **Exhibit 4**, Policies 13.64, ¶ II; 13.68, ¶ III.C.1; 13.68, ¶ III.C.3 (emphasis added); *see also* Ex. A at 57 (where Dr. Miller admitted he had the authority to issue an emergency treatment order for Degraw).) Nevertheless, none of the licensed physicians responsible for Degraw's care ever ordered emergency treatment for Degraw pending her court-ordered evaluation by Dr. Poorman or otherwise initiated any action to obtain a court order to allow them to treat Degraw against her will. (*See* Ex.A, Ex.B, Ex.C.) And, despite the express policy to the contrary, Dr. Miller testified that he could not administer medication to Degraw without a court order and that it would take "quite a while" to obtain one. (Ex. A at 57; Ex. 4, Policies 13.64, 13.68.)

Dr. Miller stated that even after receiving Trivoli's impressions, he was not required to see Degraw until March 30, 2006, *i.e.,* within fourteen days after her booking. (*Id.* at 57-58, 60.) Dr. Miller was referring to the Jail's policies numbered 13.39 and 13.75, which require comprehensive medical and mental health evaluations within fourteen days. (*See* Ex.4, Policies 13.39, ¶ II.B; 13.75, ¶ II.C (emphasis added); 13.75, ¶ II.H (emphasis added).) Dr. Miller admitted, however, that if Degraw remained untreated for fourteen days, Degraw would still be unable to cooperate on March 30 because the odds of Degraw recovering spontaneously were "very low." (*Id.* at 61-62.)

Subsequently, on March 21, 2009, Natalie Borg, D.O., visited Degraw. (Motion, Ex.D, p. 7.) Dr. Borg did not perform a physical examination of Degraw because she claimed

Degraw was "uncooperative." (*Id.* at 8.) Dr. Borg did not know whether Degraw had the capacity to consent to an examination at that time. (*Id.* at 8.) Dr. Borg claimed that, as a member of the medical team, she could not say whether Degraw was psychotic because that was a question for the psychiatric team. (*Id.* at 8-9.) Dr. Borg testified that she could only force medicate an inmate in an emergency situation and that, despite her lack of an examination, she did not perceive any medical emergency that would require such an order in this case. (*Id.* at 8-9, 12.)

Because Degraw was under close observation, she was supposed to be observed every fifteen minutes by the detention staff and every two hours by the nursing staff. (Ex.4, Policy 9.07, ¶ I.E.; Policy 9.09, ¶ III.B.1.; File Index Number 077, ¶ III.B.21; Policy 10.23, ¶IV.B.4.) Deputy Patricia Shoberg was one of the detention staff responsible for conducting the fifteen minute checks on Degraw. (*See* **Exhibit 5**, at 12, 13, 19-20, 24.) On the last day of Degraw's life, the morning of March 24, 2009, Deputy Shoberg falsified the Jail's records to indicate that she had conducted several fifteen minute checks, when she had not. (Ex.5 at 35-36, 36-38, 45.)

Aileen Mallari, R.N., was a nurse on staff during Degraw's detention. (*See* **Exhibit 6**, p. 4.) During her shifts, Mallari was responsible for checking on Degraw every two hours. (Ex.6, p. 27.) Like Deputy Shoberg, Nurse Mallari documented that she conducted several two-hour checks on Degraw, when in fact she did not. (*Id.* at 11, 13-17, 20, 24, 39-40) Mallari charted information provided to her by Shoberg. (*Id.* at 11, 17, 13, 20, 22) In relying on Shoberg's alleged observations and listing them as her own, Mallari did not know whether Shoberg had conducted her required checks or actually observed the behavior she reported to Mallari. (*Id.* at 20, 22.)

8

Mallari said she falsified Degraw's records that night because she was so busy with work that she decided to rely upon the Deputy's observations rather than her own. (*Id.* at 15.) Mallari was overwhelmed and had more work than she could handle. (*Id.* at 18.) Mallari testified that during any given shift, she was responsible for approximately 200 inmates on her wing, including thirty who required a higher level of observation. (*Id.* at 34-35.)[3] Similarly, Deputy Shoberg testified that she believed she had conducted the required checks she recorded until she watched the videos and realized she had not. (Ex. 5 at 35-36.) From this testimony, a reasonable factfinder could infer that Shoberg was too busy to accurately recall which inmates she had actually checked and which she had not.

Mallari also testified that there was no difference in her mind between a patient who is uncooperative and one who is unable to cooperate. (*Id.* at 26.)

Plaintiff's psychiatric expert, James Edgar, M.D., opined that the care Degraw received at the Jail deviated from the standard of care, that those deviations were ongoing in nature, and that they amounted to deliberate indifference to Degraw's serious medical and psychiatric needs. (*See* **Exhibit 7**, p. 60.) Dr. Edgar testified that when Degraw was booked, she was delusional as well as manic, hypomanic, or psychotic. (Ex.7 at 24-25, 58.) Dr. Edgar opined that the psychiatrist or medical doctor should have reached the conclusion that Degraw was a risk to herself or others and instituted a Baker Act or an emergency treatment order to begin to treat Degraw until a court order allowing continued treatment could be obtained. (*Id.* at 35-36.) Dr. Edgar recognized that Degraw refused her medications when offered, but testified  that it was not reasonable for the Jail staff to continue to offer Degraw oral

---

[3] Mallari said the staffing levels have changed since Degraw's death and they now allow her to do her job better and to truthfully chart her patient observations.. (*Id.* at 36-37.)

medication when she was not capable of making an informed decision about whether or not to take them. (Ex.7 at 37, 39-40.) Degraw was not "unwilling" to take the offered medications; she just lacked the capacity to do so. (*Id.* at 40.) Dr. Edgar would have imposed care on Degraw within twenty-four hours of her incarceration. (*Id.* at 41, 59.)

Dr. Edgar opined that to a reasonable degree of medical probability Degraw had a manic episode and that the Jail staff's failure to control that episode caused her death. (Ex.7 at 51-52, 60-61.) Dr. Edgar testified that a catatonic excitement, which is a manic episode in extremis, is a medical emergency because people die from catatonic excitements as well as from pacing the floor for three or four nights, not sleeping, as Degraw did according to the Jail records. (*Id.* at 56-57; Docs. 59-1, 59-2, 59-3.) The standard of care is that a manic episode is a medical emergency that must be treated – the sooner the better. (Ex.7 at 58.) Dr. Edgar testified that if you do not treat the episode, it will continue and will not resolve spontaneously. (Ex.7 at 58; *see also* Ex.2 at 70-71.)

Similarly, Plaintiff's medical expert, Arthur Herold, M.D., testified that there is always a risk of harm to an untreated, psychotic patient. (Ex.2 at 27-30.) It is not usually the psychosis itself that causes the harm, but an injury, lack of nutrition, or a failure to take other necessary medications that will cause it. (Ex.2 at 30-31.) Thus, Dr. Herold testified that when a patient is psychotic, the first step is to determine if there is an underlying metabolic problem playing a role. (*Id.* at 70.) A doctor simply cannot be sure that the psychosis is caused solely by a mental disorder. (*Id.*) Dr. Herold opined that Degraw's fluid intake and nutrition were compromised as a result of her incarceration. (Ex.2 at 33, 42-43.) Degraw was in an active psychotic state and was incapable of being attentive to her metabolic needs. (Ex.2 at 33-34.)

Dr. Herold disputed the accuracy of the Jail records to the extent one could infer from them that Degraw was eating three meals a day. (Ex.2 at 37-38, 42.) Although there was only one note in the record where Degraw refused her breakfast tray and a few others indicating that Degraw had eaten something in the course of her eight days at the Jail, Dr. Herold did not accept as fact that Degraw had been eating and drinking regularly given her cause of death and her actively psychotic condition. (*Id.* at 37-41, 43-44, 46; Docs. 59-1, 59-2, 59-3.) Dr. Herold stated that the Jail's records merely assumed she was eating, which was not a reasonable assumption, given her psychoses. (Ex.2 at 43.) Dr. Herold opined that, to a reasonable degree of medical probability, Degraw did not have the mental capability to eat or drink adequate amounts to sustain herself metabolically during her incarceration. (Ex.2, pp. 43-44, 45-48.) Dr. Herold testified that he would expect the Jail's policy to require the staff to document when a psychotic patient is not eating or drinking. (Ex.2 at 50.)

Dr. Herold also testified that Degraw was actively psychotic from the beginning to the end of her incarceration. (Ex.2 at 45.) She was delusional, having hallucinations, and out of touch with reality. (*Id.*) Because Degraw was actively psychotic, she was incapable of cooperating with the Jail staff. (Ex.2 at 51.) Although a competent person may refuse medical treatment, Degraw was not competent. (*Id.* at 56.)

Even the Sheriff's expert, Steven Helfand, M.D., concluded that on many occasions Degraw was not uncooperative, *i.e.*, refusing to cooperate, but was unable to cooperate given her mental status. (Ex.E at 22-26, 30, 31-33, 37-38, 54-55.) Dr. Helfand testified that Degraw's psychoses appeared to be consistent throughout her time at the Jail. (Ex.E at 32-33.) Indeed, Dr. Helfand used the term "refused" in his written report to include both Degraw's

11

inability to cooperate as well as any intentional, competent refusal to cooperate. (*Id.* at 35-36.) Dr. Helfand agreed that at the time of her arrest, Degraw was ill and seemed psychotic. (*Id.* at. 44.) Thus, Dr. Helfand stated that jails:

> … must direct traffic and what that means is you need to get people based on what you think is going on with them to the right place and *you need to assure that people don't fall through the cracks so you don't send them to a housing unit and they are not seen again for 14 days* …

(Ex.E at 53 (emphasis added).)

The Jail records show that during Degraw's incarceration, other than observation, she received absolutely no medical or psychiatric treatment whatsoever. (Doc. 59-1, 59-2, 59-3.) Instead, she was labeled "uncooperative" and repeatedly offered oral medication she had no capacity to accept or refuse. (*Id.*) Although the records show she was agitated, delusional, unresponsive, and pacing the cell floor for nights at a time, the medical and psychiatric staff did nothing to provide Degraw with any relief from her symptoms, even though the records reflect that Plaintiff called the Jail and explained that she needed medication to control her mental illness. (*Id.*)

**Pattern of Deliberate Indifference:**  Dr. Bailey admitted that there have been other claims against him for poor patient care at the Jail. (Ex.B at 15-20.) Similarly, Dr. Miller has previously been accused of deliberate indifference related to at least one other Jail patient. *See Troyanos v. Coats*, 372 Fed. Appx. 932 (11th Cir. 2010).[4] In 2008, another inmate died because the Jail staff failed to provide her with appropriate medical treatment for a Methicillin-resistant staph infection. (*See* **Exhibit 8.**)

12

## ARGUMENT AND LEGAL AUTHORITY

I.     **The Jail staff acted with deliberate indifference toward Degraw's serious medical and psychiatric needs.**

On the question of deliberate indifference, Plaintiff generally accepts the legal standard for deliberate indifference outlined in Defendant's Motion For Partial Summary Judgment (Doc. 54) in ¶¶21-28, pp. 6-8. That standard applies to psychiatric needs as well as to medical ones, however. *Steele v. Shah*, 87 F.3d 1266, 1269-70 (11th Cir. 1996); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) (citing *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)). In addition, whether a particular person has subjective knowledge of the risk of harm is a question of fact "subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Goebert v. Lee County*, 510 F.3d 1312, 1327 (11th Cir. 2007) (citing *Farmer v. Brennan*, 511 U.S. 825, 842, 114 S.Ct. 1970, 1981 (1994) (citations omitted)).

Deliberate indifference can be "manifested by prison doctors in taking the easier and less efficacious route in treating an inmate." *Rogers*, 792 F.2d at 1058 (citation omitted). Deliberate indifference may also be shown where there is grossly incompetent or inadequate care, the official refuses to provide medical care he knows is necessary, or the official delays in providing necessary diagnostic or medical treatment for non-medical reasons. *Fischer v. Fed. Bureau of Prisons*, 349 Fed. Appx. 372, 374 (11th Cir. 2009). The Jail staff were deliberately indifferent to Degraw's serious psychiatric and medical needs.

---

[4] Although the Eleventh Circuit affirmed the district court's 12(b)(6) dismissal because the plaintiff failed to state a cause of action, the fact remains that Dr. Miller has been previously accused of engaging in deliberate indifference toward Jail patients and, therefore, the Sheriff on notice of quality-of-care issues at the Jail.

13

There can be no doubt that since the Supreme Court's opinion in *Estelle v. Gamble*, 429 U.S. 97 (1976), the law informed the Jail staff that deliberate indifference to a pretrial detainee's need for mental and physical health care was actionable under § 1983. *See Greason v. Kemp*, 891 F.2d 829, 834 (11th Cir. 1990) (citations omitted); *Merideth v. Grogan*, 812 F. Supp. 1223, 1230-31 (N.D. Ga. 1992), *aff'd*, 985 F.2d 579 (11th Cir. 1993). As a result, at the time of Degraw's death, reasonable persons in Drs. Miller and Bailey's positions would have known that providing Degraw with inadequate medical or psychiatric care would violate her constitutional rights under the Fifth and Fourteenth Amendments. *See id.* Thus, the question becomes what did Drs. Bailey and Miller know when they chose not to provide her with any real treatment for her psychiatric and medical conditions. *See id.*

The Sheriff argues that the only reason Degraw did not receive treatment for her medical and psychiatric conditions was because she "choose" not to take her medication or "refused" to do so. (*See* Motion, p. 8 ("… medication was not provided only because Ms. Degraw chose to refuse it."); p 9 ("The only reason Ms. Degraw was not taking her medications was because she repeatedly refused to.").) That argument is fallacious given the overwhelming evidence that Degraw lacked the mental capacity to "chose" or "refuse" to do anything for her own benefit. Indeed, Drs. Miller, Edgar, Herold, and the social worker Trivoli all testified that Degraw lacked the mental capacity to cooperate with the medication requests made by the Jail staff. Dr. Bailey agreed with that assessment. (Ex. B at 49-51.) Even Dr. Helfand, the Sheriff's expert, acknowledged that on many occasions, Degraw was not mentally competent to "refuse" treatment. Thus, they all understood that Degraw was not merely refusing her medication; she simply lacked the capacity to understand what was being offered to her. As a result, the entire premise underlying the Sheriff's Motion – that Degraw

14

had the ability to cooperate with the established treatment plan for her but refused to do so – is false. Degraw was actively psychotic, delusional, and incompetent to make important decisions regarding her need for medication, nutrition, or fluids.

The real question then is whether reasonable persons in the Jail staff's positions would not have known that their conduct was grossly inadequate and constituted deliberate indifference. *Greason*, 891 F.2d at 834-35; *see also Waldrop*, 871 F.2d at 1033-34 ("The question is whether a reasonable doctor in the same circumstances and possessing the same knowledge as appellants could have concluded that his actions were lawful, *i.e.*, not deliberately indifferent to [the inmate's] psychiatric needs" (citations omitted)).

1) Drs. Miller, Bailey, and Borg were deliberately indifferent to Degraw's serious medical and psychiatric needs; and 2) they realized or should have realized they were acting in such a manner at the time. *See id.*; *see also Steele*, 87 F.3d at 1270 (discussing subjective component of deliberate indifference). A serious manic or psychotic episode like that experienced by Degraw is a serious medical/psychiatric need. *See also Gibson v. County of Washoe, Nev.*, 290 F.3d 1175 (9th Cir. 2002) (recognizing that manic depressions, now known as bipolar disorder, is a serious medical need); *Duffey v. Bryant*, 950 F. Supp. 1168 (M.D. Ga. 1997) (same). Second, Plaintiff, a lay person with a ninth-grade education (Ex.1 at 4), recognized that Degraw's need for psychiatric care was obvious when he called the police in the first place. *See Goebert*, 510 F.3d at 1317. Third, the arresting officers, also lay people, realized that she had a serious need for psychiatric treatment when they reported to Kourim that she was a Baker Act (Doc. 59-1 at 14), *i.e.*, by definition a person who is a danger to herself or others or otherwise manifestly incapable of taking care of herself. *See* § 394.467(1)(a), Fla. Stat. (2009); *see also Goebert*, 510 F.3d at 1317. Fourth, Drs. Bailey and

15

Borg saw, and Drs. Miller and Bailey understood, that Degraw was psychotic and delusional and yet they directed the nursing staff to continue offering oral medication to Degraw knowing she was mentally incompetent and, therefore, unable to comprehend the nurses' actions in this regard. As Dr. Edgar stated it simply was not reasonable for them to continue to simply offer oral medication to an incompetent person. *See Rogers*, 792 F.2d at 1058. Rather, by doing so, the doctors simply chose to take the easier and less efficacious route of treatment rather than taking the hard road of issuing an emergency treatment order and pursuing a court order authorizing continued treatment. Fifth, none of the doctors did anything to ensure that Degraw, who was actively psychotic from beginning to end, received sufficient nutrition and hydration to maintain her metabolic needs. The records on this issue are sketchy at best. Sixth, Drs. Miller, Borg, and Bailey refused to treat or physically examine Degraw because she had been labeled as "uncooperative," meaning recalcitrant – a nonmedical observation – rather than as an incompetent psychotic. Seventh, Dr. Miller also failed to treat Degraw for a second, nonmedical reason, *i.e.*, he was not required to evaluate her for fourteen days under Jail policy, and he was busy and had other patients to see. *See Fischer*, 349 Fed. Appx. at 374. Of course, fourteen days was simply too late in Degraw's case. Eighth, Trivoli, who is not a medical doctor, and Dr. Herold, who is, testified that psychosis may be the result of a metabolic disorder or medical problem as opposed to mental illness, yet none of the Jail doctors made any effort to determine the underlying cause of Degraw's psychotic state. Ninth, Drs. Bailey, Borg, and Miller knew from the records that Degraw was diagnosed by her treating physician as being bipolar and hypertensive, had been prescribed medications to treat those conditions, yet did nothing to ensure that she was actually treated for those conditions while incarcerated. These facts demonstrate the staff's deliberate indifference to Degraw's

16

serious medical and psychiatric needs. *Cf. Gibson*, 290 F.3d at 1193-94 (concluding that jury could find deliberate indifference where nurse knew inmate was in throes of manic state because of her medical training, her knowledge that the inmate was acting in a manner consistent with mental illness, and her knowledge that the inmate possessed psychotropic medication). Finally, Dr. Edgar expressly testified that the doctors' foregoing actions or omissions amounted to deliberate indifference to her serious medical and psychiatric needs.

The Jail doctors should have force medicated Degraw in accordance with the established Jail policy and existing Supreme Court precedent. *See Washington v. Harper*, 494 U.S. 210, 227 110 S.Ct. 1028 (1989) (holding that prison officials may forcibly treat a mentally ill inmate with anti-psychotic drugs "if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest."). Had they done so, Degraw would be alive today. Because they failed to provide her with any medical or psychiatric treatment whatsoever, the facts in this case show that the Jail staff violated Degraw's constitutional rights by acting with deliberate indifference to her serious medical and psychiatric needs.

## II.    The Sheriff Is Liable in His Official Capacity

The underlying violation of Degraw's constitutional rights was a byproduct of the Sheriff's policies, customs, actions, omissions, or regulations. Whether a local government has displayed a policy of deliberate indifference to the constitutional rights of its citizens is generally a jury question. *Gibson*, 290 F.3d at 1194-95. In addition, "[a] policy may be deliberately indifferent if it is facially unconstitutional or where the policy is implemented with 'deliberate indifference as to its known or obvious consequences.'" *Fields v. Corizon Health, Inc.*, 490 Fed. Appx. 174, 182 (11th Cir. 2012) (citation omitted). Policies of omission

17

may also be policies or customs that give rise to § 1983 liability, "but only if the omission 'reflects a "deliberate" or "conscious" choice' to countenance the possibility of a constitutional violation." *Gibson*, 290 F.3d at 1194; *see also Battista v. Cannon*, 934 F. Supp. 400, 404 (M.D. Fla. 1996) (citation omitted). Unlike the deliberate indifference standard, however, this standard does not contain a subjective component. *Gibson*, 290 F.3d at 1195. Therefore, Plaintiff need not prove that the Sheriff actually knew that his omissions would likely result in a constitutional violation. *Id.*

## A. Dr. Miller's Deliberate Indifference Was a Byproduct of the Sheriff's 14-Day Policy

Although the Sheriff's policies and procedures make some distinction between patients who simply refuse to cooperate in their medical/psychiatric care and patients who are incompetent to do so, the Sheriff has also implemented a policy that allows its sole staff psychiatrist to avoid evaluating a severely mentally ill patient for up to fourteen days. That policy is deliberately indifferent to the serious medical and psychiatric needs of persons like Degraw who are actively psychotic and are incapable of taking care of their own medical, psychiatric, and metabolic needs during that initial fourteen-day period. Even the Sheriff's expert, Dr. Helfand, testified that detainees should not be allowed to fall through the cracks and to remain unseen or unevaluated for fourteen days. Thus, this policy, when standing alone and when combined with the established custom of drawing a bright line between medical and psychiatric functions (discussed below), directly led to Degraw's death from a fluid and electrolyte imbalance with uncontrolled hypertension as a contributing cause. *Cf. Fields*, 490 Fed. Appx. at 185 (concluding that evidence of policy which allowed medical staff to transport prisoner to hospital only in an "emergency," which was interpreted by staff to

18

include only life-threatening situations, was sufficient to allow a jury to conclude that the prison implemented a policy while knowing that the policy would exacerbate the inmate's serious medical condition); *Gibson*, 290 F.3d at 1188-89, 1195-96 (reversing summary judgment in favor of defendant because issue of fact existed as to whether policy of delaying medical screening of inmates who are combative or uncooperative could be found to be deliberately indifferent to inmate's serious psychiatric needs and moving force behind the inmate's injuries).

It is important to note that the question of whether the Sheriff's policies violated Degraw's rights does not hinge on whether the Sheriff, as the policymaker, knew that the Sheriff's policies would pose a substantial risk of serious harm to Degraw in particular. *Gibson*, 290 F.3d at 1191. So long as a jury could infer that the policymakers knew that their policy of not screening certain incoming detainees would pose a risk to someone in Degraw's situation, a summary judgment should be denied. *See Gibson*, 390 F.3d at 1191.

Here, the Sheriff's policies make it clear that the Sheriff was keenly aware that the forced use of psychotropic medications without an inmate's informed consent may be required in situations in which the inmate presents an immediate danger of causing serious bodily injury to herself or others. (*See* Ex. 4, Policy 13.65, ¶ II.) Thus, by also allowing a psychiatric evaluation to be delayed for up to fourteen days, despite the potential for an existing and dangerous emergency, the Sheriff knew that the policy of not screening some detainees for two weeks would pose a risk to someone in Degraw's situation. Thus, a jury question exists as to whether the Sheriff's policies were the moving force behind the constitutional violation in this case. *Cf. Gibson*, 290 F.3d at 1190-91 (concluding that

19

combination of policies gave rise to inference that policies were moving force behind deliberate indifference of jail's medical staff)

B. The Jail Staff's Deliberate Indifference Was a Byproduct of the Lack of a Baker Act Policy

The Jail staff's deliberate indifference in this case was also a byproduct of the Sheriff's failure to promulgate any policy under which the Jail staff would be informed that a particular detainee was brought into the Jail under the Baker Act. Trivoli and Dr. Bailey testified that the staff was not informed of a detainee's Baker-Act status. Because the staff was ignorant of the fact that Degraw was a Baker Act patient who was actively psychotic, the Jail staff treated her as if she were capable of cooperating but simply refusing to do so rather than as the mentally incapacitated patient she was. Because the Sheriff's other policies clearly recognized that detainees at the Jail may sometimes lack the capacity to consent to medical treatment and may need forced medication, the failure to include a policy to inform staff when they are or may be dealing with a patient in that category is deliberately indifferent to persons in Degraw's condition. *Cf. Gibson*, 390 F.3d at 1191 (described *supra*). Or, at the very least, issues of fact exist that preclude summary judgment.

C. The Jail Staff's Deliberate Indifference Was a Byproduct of the Sheriff's Failure to Train on the Difference Between Incompetent/Unable to Cooperate and Refusal to Cooperate

Similarly, the violation of Degraw's constitutional rights was a byproduct of the Sheriff's failure to train staff on the difference between a truly uncooperative patient and one who is mentally incompetent and, therefore, unable to cooperate. As this Court has recently noted, "'[i]n some cases the need for training is so obvious that deliberate indifference can be established even without an earlier violation of [sic] pattern of abuse' as long as it was

20

'obvious that the municipality's failure to train or supervise its employees would result in a constitutional violation." *Christie ex rel. estate of Christie v. Scott*, 2:10-CV-420, 2013 WL 599584, *9 (M.D. Fla. Jan. 9, 2013) (citation omitted).

The fact that the Sheriff failed to train on this issue is evident by the fact that Nurse Mallari and Dr. Borg testified that they did not perceive a difference between patients who were unable to cooperate because of their mental health status as opposed to mentally competent patients who merely refused to cooperate. Similarly, the "uncooperative flow sheet" prepared for the staff's use by the Sheriff also demonstrates the lack of training in this area because it fails to distinguish between those two types of patients. (*See, e.g.* Doc. 59-3 at 1-60.) Likewise, both Drs. Bailey and Miller treated Degraw as if she were competent, yet refusing to cooperate ostensibly because she was labeled as uncooperative upon intake. Because the staff did not appreciate the difference between a competent yet uncooperative patient and an incompetent patient who was mentally unable to cooperate, all of the staff, including the doctors, treated Degraw as if she was just willful rather than mentally ill. Consequently, the staff repeatedly and stubbornly offered Degraw oral medications and recorded that she refused to take them without any regard for her lack of capacity to comprehend the offered treatment. Because they were not properly trained as to the difference between a recalcitrant/uncooperative patient and an incompetent one, the staff remained deliberately indifferent to the fact that Degraw was suffering from a serious manic episode for eight days. Because of this indifference, Degraw died. Her death was a direct result of the Sheriff's failure to train in this area.

In this case, there is a great deal of circumstantial evidence that could lead a reasonable jury to conclude that the Sheriff, as the Jail's policy maker, was aware of the risk

that his policies, or lack of policies, presented. First, the jury could conclude that the Sheriff knew that inevitably some prisoners arrive at the Jail with urgent psychiatric or medical problems that require immediate treatment. The fact that the existing policy requires detainees to be evaluated for these types of conditions upon intake indicates such knowledge. The Sheriff's policies also make it clear that the policy-makers were keenly aware that mental illness, and manic phases in particular, were within the range of mental health problems that would sometimes require urgent care. In addition, the policies reveal that the policymakers knew that people in a manic state may sometimes be combative or "uncooperative." Significantly, the Jail had a detailed policy concerning the forced administration of psychotropic drugs. In addition, the policies require those combative or uncooperative patients to be in single cells and subject to more aggressive watch schedules. (*See* Ex. 4.) Thus, the Sheriff's failure to train as to how to assess and differentiate between competent and incompetent patients directly led to Degraw's lack of medical or psychiatric treatment as well as her metabolic imbalance. Or, at the very least, an issue of fact remains as to that question. *Cf. Fields*, 490 Fed. Appx. At 183-85 (finding jury issue as to whether failure to train staff as to meaning of "emergency" or to define "emergency" for staff was moving force behind constitutional violation); *Gibson*, 290 F.3d at 1190-91 (setting forth circumstantial evidence to support claim that policy or lack thereof was moving force behind constitutional violation).

D. The Jail Staff's Deliberate Indifference Was a Byproduct of Understaffing at the Jail

Similarly, the staff's deliberate indifference was a byproduct of a custom of understaffing at the Jail. Mallari testified that she falsified certain records related to Degraw because she was too busy and overwhelmed with her workload. She was responsible for 200

22

inmates per night, including thirty inmates who required close observation. Similarly, Dr. Miller testified that he put off seeing Degraw, who he suspected was actively psychotic, for fourteen days because the policy allowed him to and "he had other patients to see." Likewise, Deputy Shoberg was so busy when she made her fifteen-minute checks that she thought she had checked on Degraw when, in fact, she had not. A reasonable inference from this testimony is that she was overwhelmed with work because the Jail was understaffed. Consequently, issues of fact exist as to whether the Jail staff's deliberate indifference was the direct result of the Sheriff's ongoing custom of understaffing the medical and psychiatric teams at the jail. *Cf. Greason*, 891 F.2d at 839-40 (affirming denial of summary judgment by concluding that a reasonable jury could find that even if policymaker did not know a particular staff member was overwhelmed, a reasonable jury could find that as the person primarily responsible for staffing the policymaker should have been aware of the understaffing and its attendant problems).

E.  The Jail Staff's Deliberate Indifference Was a Byproduct of the Lack of a Policy of Ensuring Proper Hydration and Nutrition to Actively Psychotic Patients

The Jail staff's deliberate indifference was also the result of the Sheriff's failure to promulgate a policy or procedure that would ensure proper monitoring of the nutritional and fluid intake of an actively psychotic patient. *See Gibson*, 290 F.3d at 1186 (noting that a plaintiff may establish municipal liability by showing that the deliberate indifference was the result of the municipality's omissions). In this case, the Sheriff's failure to create a policy that would ensure the proper nutrition and hydration of actively psychotic detainees, when the other policies expressly acknowledge that such detainees will reside in the Jail, demonstrates the Sheriff's deliberate indifference to actively psychotic and severely mentally ill persons.

23

Had the Jail staff kept consistent records of Degraw's nutritional and fluid intake or lack thereof, the doctors may have become aware that her metabolic needs were not being met and issued an emergency treatment order for her. Consequently, the Motion should be denied. *Cf. Gibson*, 290 F. 3d at 1189 (concluding that issues of fact existed as to whether mandatory jail policy of not evaluating uncooperative patients caused jail's medical staff's deliberate indifference to the serious medical needs of an actively psychotic patient because that patient was treated as merely angry or "pissed off" rather than incompetent).

F. The Jail Staff's Deliberate Indifference Was a Byproduct of the Established Separation of Authority Between the Medical and Psychiatric Teams

The Jail staff's deliberate indifference to Degraw was also the byproduct of an apparently well-established custom within the Jail of drawing a bright line between the unit's medical and psychiatric functions. Dr. Bailey testified that even though he was the medical director and a medical doctor, it was up to the psychiatric team to prescribe anti-psychotic medication, to force medicate a psychotic patient as necessary, and to evaluate a patient who screened positive for mental illness. Similarly, Dr. Borg testified that, even though she was a medical doctor, she could not diagnose Degraw as psychotic because that was a psychiatric function. Likewise, Dr. Miller testified that it was up to the medical staff to evaluate and treat Degraw's medical conditions such as hypertension or a metabolic imbalance. Because of this customary bright line between the authority and obligations of Drs. Borg and Bailey as the medical team on the one hand and Dr. Miller and Trivoli as the psychiatric team on the other, Degraw remained essentially unevaluated and thoroughly untreated for eight days. That this bright line created deliberate indifference is evident from the fact that although Dr. Miller

24

may be a psychiatrist, he is still a medical doctor. And likewise, although Drs. Borg and Bailey are not psychiatrists, they were fully authorized by law to issue prescriptions for the sedatives and psychotropic medications Degraw required. They were also qualified to Baker Act and force medicate her. *See* § 394.463(2)(a)3, Fla. Stat. (describing which medical professionals are authorized to initiate an involuntary examination for mental health treatment). Nevertheless, the Sheriff's policies and procedures created this bright line of separation. (*See* Ex. 4.) Consequently, a reasonable factfinder could conclude that this custom of separating the powers of the two teams as implicated by the Sheriff's policies and customs directly resulted in Degraw's death by allowing the two teams to shirk their responsibilities and to allow Degraw to fall through the cracks. Therefore, the Motion should be denied as to the Sheriff's liability in his official capacity.

## PLAINTIFF IS ENTITLED TO RECOVER DAMAGES

In this action, Mr. Degraw seeks various remedies available to him under 42 U.S.C. § 1983 including, *inter alia*, compensatory damages and punitive damages.

### I. Damages Under 42 USC § 1983

42 U.S.C. § 1983, commonly referred to as "section 1983" provides:

Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, Suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.
42 U.S.C. § 1983 (emphasis added).

25

Compensatory damages are a form of relief available to a successful plaintiff under 42 U.S.C. § 1983. Fair and reasonable compensatory damages are appropriate where the Plaintiff's injury was caused by the violation of a constitutional right. *Arroyo Lopez v. Nuttall*, 25 F. Supp. 2d 407, 410 (S.D.N.Y 1998). Mr. Degraw will ask the jury in this case to award him compensatory damages based upon his physical injuries, mental anguish and emotional distress suffered during his incarceration relative to the incidents which form the core of this case. Plaintiff will also seek an award of costs, including a reasonable attorney's fee, and respectfully reserves the right to make an application for such an award following the entry of final judgment. See Fed. R. Civ. P. Rule 54(b)(2).

## II. Damages Under the Florida Wrongful Death Act

Plaintiff's wrongful death claim is governed by the Florida Wrongful Death Act (the Act), F.S. §768.16 et. seq. It is the public policy of Florida to shift the losses resulting from a wrongful death from the decedent's survivor to the wrongdoer. F.S. §768.17. In the case at bar, Michael Degraw is the sole survivor of Jennifer Degraw who may recover money damages under the Act. Although F.S. §768.18 (1) defines survivors, *inter alia*, as the decedent's spouse and children, adult children may not recover economic damages unless they have lost support and services, and may not recover non-economic damages if there is a surviving spouse. F.S. §768.21 (1) and (3).

Michael Degraw, as the surviving spouse under the Act, may recover for his loss of Jennifer Degraw's companionship and protection in the past and future; for his mental suffering from the date of Jennifer Degraw's death; and past and future loss of support and services. F.S. §768.21 (2). In computing future lost support and services, the joint life expectancy of the

26

survivor and decedent may be considered. F.S. §768.21 (1). Future damages are reduced to present value. Id.

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by e-mail this 11th day of September, 2013 to: Mark E. McLaughlin, Esq., Beytin, McLaughlin, McLaughlin, Bolin & Willers, P.A., Post Office Box 1772 One Tampa City Center, Suite 2900, Tampa, FL 33602; Craig A. Laporte, Esquire, Proly, Laporte & Mulligan, P.A., 11914 Oak Trail Way, Port Richey, FL 34668.

/s/David G. Henry, Esq.
**David G. Henry, Esquire**
Florida Bar #: 896756
**Scott T. Borders, Esquire**
Florida Bar #: 746568
Morgan & Morgan, P.A.
One Tampa City Center
201 N. Franklin St., 7ᵗʰ FL
Tampa, FL 33602
dghpleadings@forthepeople.com
Tele: (813) 223-5505
Fax: (813) 223-5402
**Tracy S. Carlin, Esquire**
Brannock & Humphries
100 South Ashley Drive
Tampa, FL 33602
Tele: (813) 223-4300
Fax: (813) 262-0604
tcarlin@BHappeals.com

27