UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MICHAEL DEGRAW, as Personal
Representative of the Estate of JENNIFER
DEGRAW, Deceased,

    Plaintiffs,

v.    CASE NO. 8:11-CV-720-EAK-MAP

BOB GUALTIERI, in his official capacity as
SHERIFF OF PINELLAS COUNTY,
FLORIDA,

    Defendant.
_____/

## ORDER

This cause is before the Court on Defendant's Motion for Partial Summary Judgment, (Doc. 58), Plaintiff's Memorandum in Opposition to Defendant's Motion for Partial Summary Judgment, (Doc. 65), and Defendant's Reply to Plaintiff's Memorandum, (Doc. 77). Defendant in this matter is Bob Gualtieri, in his official capacity as Sheriff of Pinellas County, Florida. Plaintiff is Michael Degraw, as Personal Representative of the Estate of Jennifer Degraw ("Degraw"), deceased. This case was removed from the Pinellas County Circuit Court on April 5, 2011. For the reasons set forth below, Defendant's Motion for Partial Summary Judgment is **DENIED**.

## I. STANDARD OF REVIEW

Summary judgment should only be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits demonstrate there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "The plain language of Rule 56(a) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Materiality of the facts will be determined by the appropriate substantive law, and factual disputes that are irrelevant or immaterial will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1983). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson*, 477 U.S. at 248. But, "[i]f the evidence is merely colorable...or is not significantly probative...summary judgment may be granted." *Id.* at 249–50 (internal citations omitted).

## II. STATEMENT OF FACTS

The cause of action before this Court arises under 42 U.S.C. § 1983 for alleged violations of Degraw's 8th Amendment rights against cruel and unusual punishment, as applied to the States through the 14th Amendment.[1] Essentially, Plaintiff alleges that Degraw, who was known to have severe mental and medical issues, died as a result of inadequate supervision and medical care while held as a pretrial detainee at the Pinellas County Jail ("the Jail"). (Am. Compl. ¶18). On March 16, 2009, officers of the Pinellas County Sheriff's Office were dispatched to Degraw's home in response to a call for assistance for Degraw's husband. (Am. Compl. ¶19). Mr. Degraw

---

[1] At the time Defendant's Motion was filed, the cause included two counts against Defendant; one of which is Plaintiff's 42 U.S.C. 1983 claim, the other was a claim arising under Florida's Wrongful Death Act, Florida Statute § 768.16–26. The parties filed a joint motion to remand the wrongful death claim under Florida Statute § 768.16–26 with a pending state court action between the parties. (Doc. 100). The joint motion is granted; Count II is dismissed from the Amended Complaint.

2

informed the officers that Degraw was bipolar, had not taken her medication, and had become a danger to herself and others. (Am. Compl. ¶20). Mr. Degraw asked officers to take his wife to a mental health facility for treatment pursuant to Florida's Baker Act. (Am. Compl. ¶20). When officers attempted to detain Degraw she resisted and allegedly kicked one of the officers. As a result, officers placed her under arrest for battery on a law enforcement officer and took her to the Jail. (Am. Compl. ¶21).

Upon arrival at the Jail, the intake officers were informed that Degraw was "a Baker Act," and needed close medical observation. (Def.'s Mot. Summ. J. at ¶5). Medical staff at the Jail acknowledged that Degraw had been regularly taking Topamax for 11 years, but had not done so for forty-three days prior to her arrest. (Def.'s Mot. Summ. J. at ¶5). Because she had not taken her medication and was uncooperative, Degraw was placed in the Medical Division of the Jail under close observation. (Def.'s Mot. Summ. J. at ¶6). While at the Jail, Degraw continued to be uncooperative and refused to take her medication. (Def.'s Mot. Summ. J. ¶¶7–14). On March 24, 2009, at approximately 6:30 a.m., Degraw was found lying on the floor of her cell unresponsive. (Def.'s Mot. Summ. J. 58, ¶15). Jail staff declared a medical emergency, and had Degraw transported to Northside Hospital where she was declared dead. (Def.'s Mot. Summ. J. at ¶15).

## III. DISCUSSION

To establish a claim under § 1983 for failure to provide adequate medical care, a prisoner must provide evidence that prison officials showed deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). When the defendant is the county sheriff in his or her official capacity, the suit is "effectively an action against the government entity he [or she] represents." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092,

1115 (11th Cir. 2005). Because neither respondeat superior nor vicarious liability will attach in a § 1983 claim, the prisoner must show that the municipality itself is responsible for the alleged constitutional violation. *Id.* at 1116. Therefore, the prisoner must show that any deliberate indifference to a serious medical need was the by-product of municipal policy or custom, or that it was the result of unconstitutional action by a person with final decision-making authority. *Estate of Moreland v. Dieter*, 395 F.3d 747, 758–59 (7th Cir. 2005).

### A. <u>Serious Medical Need</u>

A serious medical need is one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). The medical need "must be one that, if left unattended, poses a substantial risk of serious harm." *Id.* (internal quotations and citations omitted).

When considering the facts in the light most favorable to the non-movant, in this case the Plaintiff, it appears clear from the record that Plaintiff can establish that Degraw suffered a serious medical need. Indeed upon admittance to the Jail, staffers were informed that Degraw had not taken her prescribed medications for the prior forty-three days, was exhibiting abnormal and bizarre behavior, and was admitted as "a Baker Act." During the time Degraw was incarcerated, she was housed in the medical facilities at the Jail and placed under close observation, which indicates that jail staff acknowledged her medical need.

During an evaluation interview conducted for the purposes of determining Degraw's psychiatric status, Ms. Trivoli[2] determined that Degraw was "not able to cooperate" with jail staff. (Trivoli Dep. at 53). Trivoli also acknowledged that Degraw was not refusing to give information, but instead was unable to do so given her psychotic state. (Trivoli Dep. at 54). Ultimately, Trivoli referred Degraw to Dr. Miller because she "felt like she needed to be seen by somebody with more expertise than [she] had." (Trivoli Dep. at 57). Additionally, while at the Jail, Degraw was prescribed several medications including potassium chloride, Topamax, Levothroxine, Zocor, Mebendazole, Cymbalta, Temazepam, and Lisinopril. (Baily Dep. at 53). And, of course, on March 24, 2009, Degraw was found in her cell unresponsive, and jail officials called a "Code 99," indicating a medical emergency. Lastly, and perhaps most compelling, is the fact that medical staff at the Jail had already initiated the process to obtain an order from the court allowing involuntary, forced medical treatment, (Pl.'s Resp. at ¶16)—a remedy clearly unnecessary for anyone without a serious medical need.

Plaintiff has established that there are sufficient facts to demonstrate that Degraw had a serious medical need while under the care and supervision of the Jail. In fact, whether Degraw had a serious medical need is not challenged by Defendant.

### B. Deliberate Indifference

If a prisoner can establish a serious medical need, she must then show that medical personnel at the jail acted with deliberate indifference toward that need. *Estelle*, 429 U.S. at 106 (stating that "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs"). Proving deliberate indifference requires a showing that the officials subjectively knew about the risk of

---

[2] Jennifer Trivoli is a licensed clinical social worker who worked at the Jail as part of the psychiatric team in 2009. She examined Degraw on March 19, 2009, and based on her evaluation referred Degraw to Dr. Miller, the staff psychiatrist.

harm to the prisoner. *Farmer v. Brennan*, 511 U.S. 825, 829 (1994). "A claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. Deliberate indifference is a high standard to meet, and a showing that medical personnel merely made a mistake or were negligent does not meet that standard. *Estelle*, 429 U.S. at 105–106. If a prisoner challenges the appropriateness of treatment, rather than whether treatment was provided at all, the prisoner has not established a deliberate indifference to a serious medical need. *See Adams v. Poag*, 61 F.3d 1537 (11th Cir. 1995).

Dr. Miller testified that during the eight days that Degraw was in Jail, he understood her medical condition to be "ostensibly uncooperative and psychotic," (Miller Dep. at 35), and acknowledged that Degraw's failure to cooperate was not voluntary, but instead a result of her psychosis which rendered her unable to cooperate. (Miller Dep. at 54-55). Dr. Miller also concluded that his clinical impression of Degraw, after he reviewed Nurse Trivoli's clinical progress note, was that Degraw "is probably psychotic, and she has verified psychotropic medications." (Miller Dep. at 49-50). Dr. Miller's revelations, along with Nurse Trivoli's testimony, indicate that Degraw was not knowingly refusing to cooperate with medical staff at the Jail, but rather was incapable of cooperation because of her altered mental state at the time. That being so, her refusal to take important medications, as well as her failure to intake vital nutrition and hydration, are properly understood as irrational decisions on her part that could eventually lead to self-inflicted harm.

Despite a clear understanding at the Jail that Degraw was unable to make important decisions regarding her health, medical staff declined to force-medicate Degraw. Dr. Miller testified, on several occasions, that he could not force-medicate Degraw because, although she

6

was uncooperative, she was not in any immediate danger. (Miller Dep. at 30, 32, 33, 34, 53, 61, 70). Even so, Dr. Miller testified that not taking a critical electrolyte, such as the potassium that Degraw was prescribed, could be considered as being a danger to one's self, (Miller Dep. at 64-65), and acknowledged that Degraw was in such a mental state that she would not have been able to determine whether or not it was in her best interest to take her medications, including the potassium, (Miller Dep. at 55). Furthermore, Dr. Miller acknowledged that he knew that Degraw stopped taking her prescribed medications, specifically Topamax and maybe others, prior to

being detained at the Jail. (Miller Dep. at 43). Additionally, Dr. Baily[3] acknowledged that he knew that Degraw had a "strong psych history" and "no known seizure," (Baily Dep. at 68-69), yet ordered her to take Dilantin (an anti-epileptic) rather than Topamax (an anti-epileptic and treatment for bipolar disorder), which she had been prescribed prior to her detainment. (Baily Dep. at 57-59).

Despite these known problems, both Dr. Miller and Dr. Baily testified that they believed Degraw to not be a danger to herself or others during the time she was at the Jail. They both testify that she was uncooperative and refusing medications, but that there were no indications that would indicate that Degraw was a danger to herself or others. Essentially, the medical staff at the Jail recognized that Degraw was uncooperative and refusing medications not because she was choosing to, but instead because she was psychotic and unable to determine what was best for her, yet decided not to force-medicate her because they claim not to have recognized the danger that Degraw posed to herself. Whether this behavior by the medical staff at the Jail amounts to deliberate indifference to a serious medical need is a question of fact not to be determined by this Court.

---

[3] Dr. Baily was the Jail's medical director in 2009, and testified that he was the person from whom other medical staff would receive guidance, medically speaking. (Baily Dep. at. 4).

Additionally, as both parties have highlighted, the Jail's policy permits the staff psychiatrist to wait up to fourteen days to fully evaluate a potentially psychotic patient. Even so, Dr. Miller testified that it is very unlikely that an uncooperative patient refusing medications will spontaneously reverse course without medications; and testified that Degraw was unlikely to be any more cooperative on day fourteen than on any other preceding day. Despite that, he testified that he chose not to see Degraw due to her failure to cooperate. Whether this policy—waiting up to fourteen days to evaluate a patient like Degraw—amounts to deliberate indifference is also a question to be resolved by a jury.

### C. By-product of Unconstitutional Corporate Acton, Policy, or Custom

Although this Court has determined that a factual dispute exists as to whether the medical staff exhibited a deliberate indifference to a serious medical need, the inquiry cannot end there. This Court must also determine whether any possible deliberate indifference is the by-product of some corporate action, policy, or custom so as to find liability on behalf of the municipality itself. That is so because Plaintiff must prove that the municipality actually caused the constitutional violation through the acts or omissions of a qualified person; or through a policy or custom that, when followed, deprived Plaintiff of her constitutional rights. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690-92 (1978).

#### 1. Corporate Action

Municipal liability for violations of a prisoner's civil rights can be found where a person with final policy-making authority either acts or fails to act in such a way that deprives the prisoner of his or her rights. *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1480 (11th Cir. 1991). The Supreme Court addressed this theory of liability in *Pembaur v. City of Cincinnati*, where it concluded that "municipal liability under § 1983 attaches where—and only where—a

deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." 475 U.S. 469, 483 (1986). Whether an official has final policy-making authority is to be determined by state law. *Id.* In essence, a municipal official deemed to have final policy-making authority pursuant to state law can subject the government to liability for his or her conduct when that conduct results in a violation of constitutional rights.

Here, Plaintiff has alleged no theory of liability based on any act or omission by any person with final policy-making authority.

### 2. Policy or Custom

Municipal liability is also appropriate where deliberate indifference to a serious medical need occurs as a result of a specific policy or custom. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 817 (1985). A municipality's *lack* of policy which leads to a violation of constitutional rights can also support a finding of liability. *Card v. Miami-Dade County, Florida*, 147 F. Supp. 2d 1334, 1343 (S.D. Fla. 2001) (citing *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991)). Furthermore, the failure of a municipality to properly train its employees may result in liability if the municipality both knew of a need to train its employees regarding a particular issue to avoid constitutional violations, and made the deliberate decision not to do so. *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 407 (1997).

To establish liability on behalf of the municipality based on a theory of custom, a plaintiff must "be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage without the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)) (internal quotations

omitted). This theory of liability is based on the notion that "a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991).

Plaintiff has outlined several theories under which they urge that the staff at the Jail were deliberately indifferent to a serious medical need as a result of policies or lack thereof. (Opp'n. Memo at 20–27). Plaintiff's first theory asserts that the Jail's policy permitting the staff psychiatrist to avoid evaluation of a detainee for up to fourteen days is deliberately indifferent to the serious medical needs of psychotic patients such as Degraw. (Opp'n. Memo at 20). Plaintiff bolsters this contention by pointing out that Dr. Helfand, a Defense expert, testified that although the Jail appropriately sent Degraw to medical observation, patients should not "fall through the cracks" or remain unevaluated for fourteen days. (Helfand Dep. at 53). Underlying Plaintiff's assertion in this regard is the notion that a proper and complete evaluation by a psychiatrist at the Jail would have revealed that Degraw was suffering from a serious medical need necessitating forced-medication procedures to ensure her health.

Defendant argues that the Sheriff, as policy-maker, must subjectively know that the policy in place would pose a risk to someone similarly situated to Degraw, and contends that Plaintiff has offered no such evidence. (Reply Br. at ¶8). This assertion misstates the law. Instead, it is staff at the Jail that must have subjective knowledge of a serious medical need to which they are deliberately indifferent, and that indifference must be the by-product of a corporate act, policy, or custom. Whether the policy-maker knows that his or her policy will result in a constitutional violation is irrelevant. Indeed, a deprivation of a detainee's constitutional right is no less unconstitutional because the policy-maker is unaware that his or her

10

policy will result in such a violation. The mere existence of such a policy is enough to trigger liability on behalf of the municipality because it can then be said that the municipality caused the detainee to be deprived of his or her constitutional right by having such a policy in place.

Here, it is undisputed that the Jail's policy pertaining to psychiatric evaluations of psychotic patients permitted such patients to go unevaluated for up to fourteen days. Whether this policy resulted in deliberate indifference to potential serious medical needs of Degraw is undoubtedly a question for a jury.

Secondly, Plaintiff alleges that a custom existed at the Jail of allowing the Jail to be understaffed, resulting in the inability to properly care for patients at the Jail and to properly follow Jail procedures. To support this contention, Plaintiff points to Nurse Mallari's testimony in which she stated that she falsified records relating to Degraw because she was overwhelmed and could not properly attend to the requirements of the prisoners. (Am. Compl. at ¶44). Additionally, Deputy Shoberg testified that although she indicated on the "watch form" that she conducted the required fifteen-minute checks required for a patient on "close observation" status, she, in fact, did not do so and falsified the records indicating that she had. (Am. Compl. at ¶43). When viewing the facts most favorably to the Plaintiff, these failures could be understood to be the result of constant understaffing at the Jail. Whether these shortfalls are the result of a custom of understaffing at the Jail is also a material dispute necessarily left for a jury.

Based on the discussion above, this Court finds that a municipal policy exists in which a jury could find caused a deliberate indifference to a serious medical need suffered by Degraw. Accordingly, it is:

**ORDERED** that Defendant's Motion for Partial Summary Judgment (Doc. 58) is **DENIED.**

**DONE** and **ORDERED** in Chambers, in Tampa, Florida this 12th day of November, 2013.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT COURT JUDGE

Copies to: All parties and counsel of record